304 Ga. 356
FINAL COPY

S18A0957. THE STATE v. TURNER.

HUNSTEIN, Justice.

Appellee Arielle Turner was indicted by a Douglas County grand jury for the December 2015 death of her infant child. Appellee filed a pre-trial motion to suppress, seeking to prohibit the State from adducing items that were seized from her house during what she says was an unlawful search. Following a hearing, the trial court agreed that the search was unlawful and granted the motion. The State now appeals; finding no error, we affirm.

In reviewing a trial court's ruling on a motion to suppress, this Court must construe the record in the light most favorable to the factual findings and judgment of the trial court and accept the trial court's findings of disputed facts unless they are clearly erroneous. Hughes v. State, 296 Ga. 744 (1) (770 SE2d 636) (2015); see also Caffee v. State, 303 Ga. 557, 557 (814 SE2d 386) (2018) ("An appellate court also generally must limit its consideration of the disputed

facts to those expressly found by the trial court.") (citation and punctuation omitted). Viewed in this way, the evidence at the suppression hearing shows that on December 3, 2015, Appellee and her mother Terry Turner called 911 to report that Appellee's ten-week-old baby was unresponsive. EMTs arrived at the residence (which Appellee shared with her mother) and began treating the infant.

Eventually, Appellee left the house with the EMTs to take the child to the hospital; Terry remained at home. Shortly thereafter, Douglasville Police Officer Joseph Wells arrived at the house and, while standing on the front porch, comforted a very upset Terry. Officer Wells testified that, during their conversation, Terry requested that they go inside and sit, noting that her legs were hurting and that it was cold outside. Officer Wells agreed, followed Terry inside the home, and sat down at the kitchen table. He did not search the house or seize any items. Victoria Bender, a detective with the Douglasville Police Department, also responded to the residence. She entered the home through an already open front door and sat with Terry and Officer Wells at the kitchen table. Detective Bender did not search the house or seize any items during this time.

Meanwhile, the child was taken to Douglas Wellstar Hospital where she eventually died. Investigators did not observe any marks or bruising on the child's body, saw no signs of foul play or evidence that a crime had been committed, and believed her death to be accidental.

Back at the Turner residence, Detective Bender was notified of the child's death, and she relayed this information to Terry. Terry testified that, after being notified of the child's death, officers instructed her that the home was a crime scene which no one was allowed to leave or enter. Shortly thereafter, more officers arrived, including a crime scene investigator[1] who, at some point, began photographing the residence. Detective Bender started questioning Terry about the events leading up to the infant's death and asked Terry to "take her around and tell [her] what went on last night." Terry testified that she did not consent to the officers entering or searching her home, and she explained that she did not stop the officers because Detective Bender "just told me that's what they was [sic] supposed to do."

---

[1] At the motion hearing, none of the law enforcement officers could explain how the crime scene investigator was notified or who summoned him to the scene, and the State did not call him as a witness at the hearing.

Appellee was returned to her house by Todd Garner, a sergeant with the Douglasville Police Department. When they arrived, law enforcement officers were still inside the residence with Terry. Around the same time, Mark Alcarez, the chief coroner for Douglas County, also arrived at the residence. Alcarez entered the home and immediately began "looking at things which the SUIDI[2] form suggests."[3] Meanwhile, Appellee answered questions from Detective Bender regarding what had occurred prior to the child's death. While Appellee spoke with officers, she pointed out specific items that were part of the baby's sleep environment and diet, including a car seat, blankets, pacifiers, a bottle, and a diaper bag containing, among other things, medicine and formula.[4] Sergeant

---

[2] "SUIDI" stands for Sudden Unexplained Infant Death Investigation. The SUIDI form is generated by the U. S. Department of Health and Human Services and is used to collect data on sudden infant deaths. The form seeks information regarding the child's medical and dietary history, the mother's pregnancy history, and the circumstances surrounding the child's death, and also includes a section for a scene investigation.

[3] This included checking the types of heating and cooling systems within the home (central air, gas/electric furnace, ceiling fan, radiant heat, etc.), noting the temperature of the room where the infant was found unresponsive, locating the source of drinking water at the home, and looking for other defects within the home such as insects, peeling paint, rodents, pets, dampness, standing water, mold growth, odors or fumes, alcohol containers, and drug paraphernalia. The form also directs the investigator to note other "factors, circumstances, or environmental concerns about the incident scene" that may have impacted the child.

[4] These items, the video, and photographs were the focus of Appellee's motion to suppress.

Garner also took a short video with his cell phone while inside the home. Law enforcement seized the items identified by Appellee and stored them at the sheriff's office until the items were released to the medical examiner.

At the hearing on Appellee's motion to suppress, all of the testifying officers confirmed that they did not obtain a search warrant, that they did not have probable cause to search the house, that they did not ask for permission to search the home, and that they did not believe a crime had occurred when the search of the home took place. Instead, the officers and Alcarez explained that their investigation was done pursuant to Georgia's Death Investigation Act. See generally OCGA § 45-16-20 et seq.[5] In total, law enforcement remained in Appellee's home for approximately three hours questioning witnesses, searching, photographing and videotaping the home, and seizing evidence.

In granting Appellee's motion to suppress, the trial court found the following: law enforcement conducted a warrantless search of Appellee's home; no exigent circumstances existed at the time of the search; while Officer Wells' initial entry into the residence was the result of Terry's voluntary consent, that

_____

[5] Because the search took place in December 2015, the 2015 version of the Act applies.

consent was limited and did not grant other officers consent to search the home; Appellee and Terry did not consent to the search of their home but merely acquiesced to the presence and authority of law enforcement; and the video and photographs of Appellee's re-enactment were tainted by the unreasonable search.

On appeal, the State argues that the trial court's grant of Appellee's motion to suppress is clearly erroneous because both Appellee and her mother consented to the search of the home. The State also argues that, because the search was led by the county coroner pursuant to Georgia's Death Investigation Act, the evidence collected pursuant to that investigation is not subject to the exclusionary rule. We address each argument in turn.

1. The State argues that the search was lawful because Appellee and Terry expressly[6] and voluntarily permitted officers and the coroner into their home and consented to the search. Reviewing the record in the light most favorable to the factual findings and judgment of the trial court, we cannot agree.

---

[6] At the hearing on Appellee's motion to suppress, the State argued that officers had tacit consent to enter the Turner residence. The State has abandoned this argument on appeal; accordingly, we do not address it.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U. S. Const. Amend. IV. "Ordinarily, a search [by law enforcement] is deemed to be reasonable when conducted pursuant to a judicial warrant, which the Fourth Amendment requires to be supported by probable cause." Caffee, 303 Ga. at 560 (citing U. S. Const. Amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]"); and Mincey v. Arizona, 437 U. S. 385, 390 (98 SCt 2408, 57 LE2d 290) (1978)). "Searches conducted without a warrant are unreasonable under the Fourth Amendment unless they fall within a well-established exception to the warrant requirement," including "searches conducted pursuant to consent, the existence of exigent circumstances, and searches incident to a lawful arrest." (Citations omitted.) Caffee, 303 Ga. at 560. Indeed, a valid consent to a search "eliminates the need for either probable cause or a search warrant." Brooks v. State, 285 Ga. 424, 425 (677 SE2d 68) (2009) (citing Schneckloth v. Bustamonte, 412 U. S. 218, 219 (93 SCt 2041, 36 LE2d 854) (1973)).

"In order to justify a warrantless search on the grounds of consent, the State has the burden of proving that the consent was freely and voluntarily given under the totality of the circumstances." Raulerson v. State, 268 Ga. 623, 625 (491 SE2d 791) (1997). "[M]ere acquiescence in an officer's authority will not demonstrate the accused's voluntary consensual compliance with the request made of him." State v. Tye, 276 Ga. 559, 562 (580 SE2d 528) (2003). When reviewing questions of voluntariness, the trial court's determination is a question of fact and, "[u]nless clearly erroneous, the trial court's ruling on disputed facts and credibility at a suppression hearing must be accepted on appeal." (Citation and punctuation omitted.) Arrington v. State, 286 Ga. 335, 345 (687 SE2d 438) (2009).

Turning to the trial court's order, the court found that "neither [Appellee] nor her mother gave consent for the officers to search, photograph, videotape, or remove items from the house" and, instead, merely acquiesced to the presence and authority of law enforcement. The State asserts that the trial court's findings are clearly erroneous because the record established that law enforcement and the coroner were given a valid consent to search the home by both Appellee and her mother. However, the trial court's determination that

neither Appellee nor her mother voluntarily consented to the search and seizure of evidence from their home is supported by the record.

(a) *Terry's Consent*

The State argues that, because the trial court found that Terry voluntarily consented to Officer Wells' initial entry into her home, the trial court erred in failing to extend that permission to all members of law enforcement who subsequently entered the residence. Where authority to search is based upon consent, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" (Emphasis supplied.) Florida v. Jimeno, 500 U. S. 248, 251 (111 SCt 1801, 114 LE2d 297) (1991). Cf. State v. Peterson, 273 Ga. 657, 659 (543 SE2d 692) (2001) (additional officers joining colleague's legal intrusion based upon exigent circumstances "must confine their intrusion to the scope of the original invasion" (citations and punctuation omitted)). Here, a reasonable officer would understand that Terry's invitation for Wells to enter her kitchen was not consent for additional officers to conduct a search of the home.

Accordingly, to the extent that additional officers had permission to enter the home, the trial court was correct to conclude that the initial consent was limited to the scope originally granted to Wells and did not encompass consent to *search* the home.

The record further supports the trial court's finding that Terry merely acquiesced to the authority of the officers. The record reflects that, after the child was pronounced dead, numerous members of law enforcement responded to the Turner residence in order to investigate the death of the child without probable cause, without a search warrant, and without even a suspicion that a crime had been committed. The officers admitted at the hearing that they did not ask Terry for consent to search the home, to take photographs or video, or to remove any items from the residence. Despite this, at least four members of law enforcement, including a crime scene investigator (whose presence, astoundingly, no one can explain) participated in a search of Appellee's home.

Moreover, Terry testified that, after she was notified that the child had died and before Appellee returned to the house, Detective Bender began questioning her regarding what occurred the night before. Terry explained that she responded to Detective Bender's questions and requests and did not stop

10

officers from searching or photographing the home because she was told by officers that the area was a crime scene and "that's what [law enforcement] was supposed to do."

Giving proper deference to the trial court's factual findings and credibility determinations, and based upon the totality of the circumstances, the record supports the trial court's conclusion that Terry merely acquiesced to the authority of law enforcement rather than voluntarily consenting to the search of her home.

(b) *Appellee's Consent*

Regarding Appellee, the State contends that she voluntarily consented to Coroner Alcarez's entry into her home so he could continue his child death investigation, and that this permission extended to members of law enforcement. In support of this argument, the State points to Alcarez's hearing testimony wherein he explained that Appellee consented to returning to the residence in order to participate in a doll re-enactment as required by the SUIDI form. The trial court, however, did not credit this testimony, finding, instead, that the State failed to show that Appellee "express[ed] verbal consent freely and voluntarily

11

given" to search her home. Indeed, a review of the record supports the trial court's findings that Appellee did not voluntarily consent to the *search* of her home.

The record shows that Appellee was escorted back to her home by Sergeant Garner in his official police vehicle. When they arrived, at least two other officers were already at the scene and had already interviewed Terry. Moreover, as soon as Appellee entered her home, Detective Bender began questioning Appellee about the events that led to the child's death while the crime scene investigator took pictures, and Sergeant Garner took a short video of Appellee and the inside of her home.[7] During Appellee's discussion with law enforcement, officers seized numerous items from the house without permission; the items were taken from the home and stored at the police department. Once again, officers admitted that they did not have a search warrant, did not have

[7] The State argues that Sergeant Garner merely recorded a short portion of a doll re-enactment in which, the State alleges, Appellee had previously agreed to participate. The trial court did not specifically rule on this issue, but did find that the State failed to show Appellee voluntarily consented to the search of her home. Having reviewed the video recording, which is approximately two minutes long, we conclude that the video was not of a doll re-enactment, but was, instead, a recording of law enforcement's search of Appellee's home. See State v. Allen, 298 Ga. 1, 2 (779 SE2d 248) (2015) (a reviewing court may "consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape" (citation and punctuation omitted)).

probable cause to search the home, did not ask Appellee for permission to search the home, and did not ask Appellee for permission to seize any evidence, or to photograph or to videotape the residence. Giving proper deference to the trial court's factual findings and credibility determinations, and based upon the totality of the circumstances, the record supports the trial court's conclusion that Appellee did not voluntarily consent to the search of her home but merely acquiesced to the authority of law enforcement.

2. Next, the State argues that, because the coroner led the investigation at the Turner residence under Georgia's Death Investigation Act (OCGA § 45-16-20 et seq.), and law enforcement merely assisted, the investigation could rightly occur without a warrant or other exception to the Fourth Amendment's warrant requirement for law enforcement. Pretermitting whether Georgia's Death Investigation Act conveys such authority to a coroner, as the trial court concluded, and the record supports, the investigation at issue here was plainly led by law enforcement, not the coroner. The record shows that Detective Bender arrived at the Turner residence and remained there for an extended period of time prior to the coroner's arrival. During this time, Detective Bender

questioned Terry while other officers photographed and searched the home. Even after the coroner arrived at the residence, Detective Bender continued to lead the investigation into the child's death, questioning Appellee regarding the events leading up to the infant's death. Meanwhile, other members of law enforcement, including a *crime scene investigator*, continued to search the home, take photographs and video, and, *at Detective Bender's direction*,[8] collected items of relevant evidence, which were then stored at the Douglasville Police Department until later retrieved by the medical examiner. Based on the foregoing, we cannot say that the trial court erred.

Finally, for the first time on appeal, the State contends that because the evidence was collected during the investigation into an unexplained child death, it is not subject to the exclusionary rule. Because the State failed to raise this issue below, it is not preserved for appellate review. See McClendon v. State, 299 Ga. 611, 616 (791 SE2d 69) (2016) ("Because [Appellant] raise[d] an issue

---

[8] The State asserts that it was undisputed that the coroner directed the investigation and instructed officers on what evidence to collect from the home. However, on cross-examination, Detective Bender testified that *she* directed the crime scene investigator regarding which items to collect as evidence. Clearly, the trial court credited Detective Bender's testimony.

14

on appeal that was not presented or ruled upon by the trial court, [its] argument is not preserved for review by this Court.").

Judgment affirmed. Hines, C. J., Melton, P. J., Benham, Nahmias, Blackwell, Boggs, and Peterson, JJ., concur.

Decided August 27, 2018.

Motion to suppress. Douglas Superior Court. Before Judge McClain.

Ryan R. Leonard, District Attorney, Emily K. Richardson, Sean A. Garrett, Bonnie K. Smith, Anna Vaughan-Upshaw, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Dolly M. Fairclough, for appellee.