**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and COOMER, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 14, 2019**

# In the Court of Appeals of Georgia

A18A1495, A18A1496. THE STATE v. BURGESS, and vice versa.   DO-048 C, DO-049 C

DOYLE, Presiding Judge.

Steve Burgess was indicted on possession of methamphetamine with intent to distribute,[1] possession of a Schedule II controlled substance,[2] and two counts of unlawful possession of explosive devices.[3] After a hearing on Burgess's motion to suppress, the trial court entered an order granting in part and denying in part the

---

[1] OCGA § 16-13-30 (b).

[2] OCGA § 16-13-30 (a).

[3] OCGA § 16-7-82 (a). Burgess was charged with possession of electronic blasting caps, which are "small explosive device[s] that [are] combined with a fuse to detonate a larger explosive." See Blasting Caps at https://www.merriam-webster.com/dictionary/blasting%20caps (last visited Mar. 11, 2018). See also OCGA § 16-7-81 (22) (listing materials that constitute "explosives within the meaning of" Article 4, Title 16 of the Georgia Code.).

motion. In Case No. A18A1495, the State appeals from the order, arguing that the trial court erred by suppressing certain evidence and statements, while in Case No. A18A1496, Burgess argues that the trial court erred by denying in part his motion, finding that the search of his house was authorized under a family violence ex parte temporary protective order ("TPO"), and admitting certain evidence and his post-arrest statements. For the reasons that follow, we reverse the trial court's order to the extent that it denied in part Burgess's motion to suppress and affirm to the extent it granted in part the motion. Officers were not authorized by the TPO to enter Burgess's house without a warrant authorizing entry, and neither consent nor the good faith exception existed in this case to obviate the need for a warrant.

The record shows that on May 31, 2013, A. S. appeared in superior court in Gilmer County, Georgia, and filed a verified petition for a TPO pursuant to OCGA § 19-13-3 against Burgess, with whom A. S. had a long-term relationship and shared a child. There is no transcript of the ex parte TPO hearing, but A. S. testified at the suppression hearing. According to her testimony, she and Burgess became romantically involved in 2009, and she moved into his home at 2094 Talking Rock Road at that time. The two later had a child together, but Burgess and A. S. increasingly fought, resulting in an incident in March 2013 when Burgess was

2

physically violent, hitting her and brandishing a weapon when she retreated to her vehicle with their child; although she left their home with the child for a short time, she returned to live at the house with Burgess. On May 15, 2013, after another altercation, A. S. left the home and drove herself and the child to a hospital to receive treatment for A. S.'s purported illness; on the way, she received a phone call from Burgess making threats to her, including threatening to blow up or kill her family. At the hospital, medical providers observed injuries on A. S. consistent with abuse, and she was referred to a case worker, who sent A. S. to a domestic violence shelter. At the shelter, A. S. received information about obtaining a protective order, and after staying with her grandmother briefly, she moved to a safe house.

At the end of May, while at the safe house, A. S. filed a TPO petition in which she alleged that Burgess had threatened to kill her. The same day, A. S. appeared before a superior court judge and testified under oath about the incidents with Burgess; the judge later contacted an investigator from the district attorney's office to interview A. S. after the hearing. A. S. testified that she told the judge about the threat and other incidents, and that Burgess had multiple guns and explosives in their home.

3

In the order granting A. S.'s TPO petition, the judge (1) directed that A. S.'s address be kept confidential, (2) restrained Burgess from going to A. S.'s or their child's residence, school, or workplace; (3) restrained Burgess from coming within 100 yards of A. S. or their child; (4) prohibited Burgess from having any contact with A. S. through various means of communication; (5) awarded A. S. temporary custody of their minor child; (6) allowed A. S. to go into 2094 Talking Rock Road and take personal property she listed on her petition on a date determined by the sheriff; and (7) further ordered "that Pickens Co. Sheriff remove all firearms and explosives from the resid. and secure the same."

That same day, an agent from the Georgia Bureau of Investigation ("GBI") interviewed A. S. about any knowledge she may have about homicides allegedly committed by Burgess and his possession and sale of methamphetamine. A. S. described various events that led her to believe Burgess committed a homicide, alleged that Burgess was selling methamphetamine, which she stated could be found at 2094 Talking Rock Road, and described the location of the explosives and firearms. She also offered to give the agent keys to 2094 Talking Rock Road and consented to a search of that property and any other property related to her. The interview ended around 7:00 p.m. that night, and the agent thereafter

4

got resources together. I was understanding there was a possibility or what had already been signed a protective order for [A. S.] to conduct further investigation into what was going on at the 2094 residence, whether there was a homicide or not and follow-up on information that she provided. There were also drugs and guns on the property there.

An agent testified that the following Monday, June 3, he met with members of the Pickens County Sheriff's Office and a bomb technician in order to serve the TPO. The agent and other officers served the order on Burgess that morning, and the agent testified that Burgess waited outside the residence in the driveway and in and around a patrol car while the officers searched; the agent did not recall that Burgess was in handcuffs at any point. Explosives were found in the bathroom closet, where A. S. described them as being stored. Agents testified that they believed the TPO gave them authority to enter the property and seize the items without a separate warrant.

Simultaneous to the search of the house, agents searched the exterior of the grounds around the house and an outbuilding/garage about 25 feet from the back porch; they discovered therein a small amount of methamphetamine in the lid of a spray paint can, which an agent testified could have held explosive blasting caps. After discovery of the methamphetamine, an agent read Burgess his *Miranda*[4] rights

_____

[4] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602) (16 LEd2d 694) (1966).

5

and told him they had found methamphetamine; Burgess agreed to continue to speak to the agent, explaining that he inherited the explosives from his father. The agent presented Burgess with a "Waiver of Constitutional Rights to a Search Warrant" form that allowed the agents to search the entire property, including any vehicles, residence, outbuildings, papers, materials, and any other property they so chose, which Burgess signed. Firearms were found throughout the property and in a vehicle, and an additional large amount of methamphetamine was found in the loft or ceiling area of the same outbuilding/garage. Burgess also opened a safe for the agents, which safe contained $2,300 in currency. At that point, Burgess was taken to the police station, was re-read *Miranda* rights, and was interviewed. Burgess answered the agent's questions, going so far as to make a phone call to his alleged methamphetamine supplier to assist agents in their investigation.

Burgess filed a motion to suppress, which he later amended, arguing that the search was not performed with a warrant, probable cause, or valid consent, among other things. After a hearing on the motion, the trial court granted it in part and denied it in part. The court found that although officers lacked a warrant, the TPO served as a "valid order" giving officers authority to enter Burgess's home and seize explosives and firearms. The court, however, found that the order's language limited

6

the scope of the officers' authority to entry only of the main house and not the detached outbuilding/garage or the vehicle, and it suppressed evidence of the methamphetamine and any firearms discovered outside the main house. The court also suppressed statements made by Burgess during the pendency of the search prior to officers transporting him to the police station. The court found that Burgess's execution of the written waiver and any verbal consent to search the outbuilding/garage and vehicle were not freely and voluntarily given because the officers did not have the initial authority under the TPO to enter any building other than the main house. The trial court, however, found that Burgess freely and voluntarily waived his rights prior to giving his statement at the police station and did not suppress the interview. The State and Burgess appeal.

> In *Miller v. State*,[5] [the Georgia Supreme Court] reiterated three fundamental principles which must be followed when conducting an appellate review of a trial court's ruling on a motion to suppress. First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and h[er] findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support them. Second, the trial court's decision with regard to

[5] 288 Ga. 286 (702 SE2d 888) (2010).

7

questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. These principles apply equally whether the trial court ruled in favor of the State or the defendant.[6]

1. Burgess argues that the TPO did not constitute a valid search warrant and was not a substitute for a search warrant authorizing entry to the home. We agree.

The Fourth Amendment of the United States Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[7]

As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness. Our cases have determined that where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant. Such a warrant ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead

---

[6] (Citation and punctuation omitted.) *Brown v. State*, 293 Ga. 787, 803 (3) (b) (2) (750 SE2d 148) (2013), quoting *Miller*, 288 Ga. at 286-287.

[7] U.S. Const. amend. IV.

of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.[8]

Additionally, the Georgia Constitution protects against unreasonable search and seizures,[9] adopting similar language to the Fourth Amendment and providing that

---

[8] (Citations and punctuation omitted.) *Riley v. California*, 573 U. S. 373, 381-382 (II) (134 SCt 2473, 189 LEd2 430) (2014). See also *Park v. State*, __ Ga. __ (2) (b) (Case No. S18A1211, decided Mar. 4, 2019) (addressing the special needs exception to the warrant requirement and explaining that "a reasonable search generally requires that law enforcement officials obtain a judicial warrant based on a showing of probable cause indicating that a person to be seized has committed a crime or that a place to be searched contains evidence of a crime."), citing *Skinner v. R. Labor Exec. Assn.*, 489 U. S. 602, 619 (III) (A) (109 SCt 1402, 103 LE2d 639) (1989). See also *Teal v. State*, 282 Ga. 319, 322-323 (2) (647 SE2d 15) (2007) ("The Fourth Amendment proscribes all unreasonable searches and seizures, and searches conducted without prior judicial approval are per se unreasonable under the Fourth Amendment, subject to specifically established and well-delineated exceptions.").

[9] See *Underwood v. State*, 13 Ga. App. 206, 213 (78 SE 1103) (1913) ("[T]he right to be free from unreasonable search and seizure is a "sacred civil jewel[] which [has] come down to us from an English ancestry, forced from the unwilling hand of tyranny by the apostles of personal liberty and personal security. [It is] hallowed by the blood of a thousand struggles, and [was] stored away for safe-keeping in the casket of the constitution. It is infidelity to forget [it]; it is sacrilege to disregard [it]; it is despotic to trample upon [it]. [It is] given as a sacred trust into the keeping of the courts, who should with sleepless vigilance guard [this] priceless gift[] of a free government.").

9

no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized. In deciding the question of probable cause, the magistrate must make a practical, common-sense decision whether, given all the circumstances, there is a reasonable probability that the fruits, instrumentalities, or evidence of a crime will be found in a particular place.

Besides these constitutional provisions, the legislature has codified additional requirements for the issuance of search warrants. A search warrant may be issued only to a law enforcement officer charged with the duty of enforcing criminal laws, the officer must state sufficient facts in writing to show probable cause that a crime is being committed or has been committed, a judicial officer must evaluate and independently decide whether the officer has shown probable cause, and the search warrant must be executed within ten days and a copy left with a person or at the premises where the items were seized.[10]

Moreover, this State's warrant statute states that "[a] search warrant shall not be issued upon the application of a private citizen or for his aid in the enforcement of personal, civil, or property rights."[11]

---

[10] (Footnotes omitted.) *King v. State*, 276 Ga. 126, 128 (2) (577 SE2d 764) (2003) ("*King II*").

[11] OCGA § 17-5-20 (b). See generally OCGA § 17-5-21.

In this case, A. S. applied for a TPO "[under Article 13 of Title 19] by filing a petition with the superior court alleging one or more acts of family violence."[12] "Upon the filing of a verified petition in which the petitioner alleges with specific facts that probable cause exists to establish that family violence has occurred in the past and may occur in the future, the court may order such temporary relief ex parte as it deems necessary to protect the petitioner or a minor of the household from violence."[13] Under this statutory scheme, "[t]he court may. . . grant any protective order . . . to bring about a cessation of acts of family violence."[14] An order under this code section may:

(1) Direct the respondent to refrain from such acts;

(2) Grant to a party possession of the residence or household of the parties and exclude the other party from the residence or household;

(3) Require a party to provide suitable alternate housing for a spouse, former spouse, or parent and the parties' child or children;

---

[12] OCGA § 19-13-3 (a).

[13] OCGA § 19-13-3 (b).

[14] OCGA § 19-13-4 (a).

11

(4) Award temporary custody of minor children and establish temporary visitation rights;

(5) Order the eviction of a party from the residence or household and order assistance to the victim in returning to it, or order assistance in retrieving personal property of the victim if the respondent's eviction has not been ordered;

(6) Order either party to make payments for the support of a minor child as required by law;

(7) Order either party to make payments for the support of a spouse as required by law;

(8) Provide for possession of personal property of the parties;

(9) Order the respondent to refrain from harassing or interfering with the victim;

(10) Award costs and attorney's fees to either party; and

(11) Order the respondent to receive appropriate psychiatric or psychological services as a further measure to prevent the recurrence of family violence.[15]

---

[15] Id.

In filing her petition for a TPO under this statutory scheme, A. S. did not attempt to have a warrant issued to enforce her personal rights; instead, the superior court sua sponte drafted a portion of the TPO directing the sheriff to seize Burgess's firearms and explosives based on A. S.'s sworn testimony in support of her petition and its finding of probable cause that an act of family violence occurred. Upon receiving a call from the superior court judge, obtaining a copy of the TPO, and interviewing A. S., officers treated the TPO as a search warrant, serving it on Burgess and entering his home to seize the specified property.

Neither briefing nor independent research have revealed a case in which the courts of this State have approved the use of a TPO in place of a search warrant issued according to the procedure in OCGA § 17-5-20. *King v. State*,[16] addressed a right to privacy challenge to the State's subpoena of a defendant's medical records from a hospital.[17] The Georgia Supreme Court explained that "the State is not entitled to exercise indiscriminate subpoena power as an investigative substitute for

---

[16] 272 Ga. 788, 791-792 (1) (535 SE2d 492) (2000) ("*King I*").

[17] See id. at 788-789.

13

procedural devices otherwise available to it in the criminal context, such as a search warrant."[18]

Here, the trial court found that the TPO statute allowed the superior court judge to issue the TPO including the directive to officers to enter Burgess's home and seize explosives and firearms because the TPO statute authorized the entry of "any" protective order, and thus, it was a "valid order" authorizing the search. In so holding, the trial court compared the TPO statutory scheme to that addressed in *Rawcliffe v. Rawcliffe*,[19] wherein this Court determined that a trial court did not have authority under OCGA § 16-5-94, another protective order statute, to prohibit a respondent of a protective order from owning firearms for the duration of the protective order. Regardless of whether a court could order a respondent to surrender his guns and explosives under this statutory scheme,[20] the question before the trial court in

---

[18] Id. at 791 (1).

[19] 283 Ga. App. 264, 265 (1) (641 SE2d 255) (2007).

[20] We question whether such an order is permissible. The plain language of the TPO statute and the available remedies to the trial court are couched in terms of preventing the respondent from approaching, harassing, or contacting the petitioner; assigning property or dividing property between the petitioner and respondent; temporarily setting child custody, visitation, and orders of support between the parties; and ordering temporary intervention services to prevent violence between the parties. There is no language included that would allow a court to take possession of

14

reviewing the motion to suppress is whether the TPO's directive to the sheriff constituted a warrant, and if not, whether an exception to the warrant requirement existed or whether the officer's actions based on the TPO were reasonable.

Compared to the subpoena statute addressed in *King*, the TPO statute requires sworn testimony, application of a probable cause standard, and issuance by a judicial officer.[21] We are mindful these safeguards are central to the protections in the warrant statute. Nevertheless, the procedure to obtain a TPO does not contain all the safeguards codified in this State's warrant statute (specifically, application by a law enforcement officer), and we decline to hold that, under these circumstances, issuance of the TPO under this statutory scheme met the "warrant and probable cause standard" of the Fourth Amendment and OCGA § 17-5-20, obviating the need for officers to first obtain a warrant to enter Burgess's property.[22] This conclusion is

---

one of the parties' personal belongings without also assigning ownership to the other party in the proceeding. See generally OCGA § 19-13-4. This question need not be determined in this case, however, because this is not an appeal from the TPO.

[21] OCGA §§ 19-13-3, 19-13-4. Compare with *King I*, 272 Ga. 791-792 (1).

[22] See *Park*, __ Ga. at (2) (b) (ii) (discussing application of the special needs exception to searches outside of the normal warrant and probable cause requirement); *King II*, 276 Ga. at 128 (2). See also *Henderson v. City of Simi Valley*, 305 F3d 1052, 1057-1058 (1) (A) (9th Cir. 2002) (reviewing under the purview of 42 USC § 1983 a search by officers assisting a petitioner in retrieving her property as authorized by

reinforced by the explicit prohibition in OCGA § 17-5-20 (b) against issuing warrants on application by a private citizen.[23] "[T]he warrant requirement is an important working part of our machinery of government, not merely an inconvenience to be somehow weighed against the claims of police efficiency,"[24] and the State has not articulated a need to deviate from that requirement in this instance. Accordingly, the trial court erred by finding that the TPO authorized the search of Burgess's home.

2. The State contends that even if the search was not authorized, Burgess and A. S. separately consented to the search and the trial court erred by finding otherwise.

> It is well settled that a valid consent to a search eliminates the need for either probable cause or a search warrant. In order to justify a warrantless search on the grounds of consent, the State has the burden of proving that the consent was freely and voluntarily given under the totality of the circumstances. It is only by analyzing all the

---

a domestic protective order and finding the search authorized by the special needs exception to the Fourth Amendment because the police were not engaged in a law enforcement function and merely effectuated the search in support of the petitioner).

[23] Compare with *State v. Nelson*, 283 Mont. 231, 235-236, 244 (3) (941 P2d 441) (1997) (allowing an investigative subpoena of medical records based on an application by a prosecutor including a sworn affidavit and only upon demonstration of a probable cause requirement, essentially the same as petitioning for a warrant).

[24] (Punctuation omitted.) *Riley*, 573 U. S. at 401 (IV).

16

circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.[25]

"Mere acquiescence in an officer's authority will not demonstrate the accused's voluntary consensual compliance with the request made of him."[26] "Under appropriate circumstances, [however] the State may prove that consent to search given by a defendant . . . after a search validates a prior otherwise illegal search."[27]

(a) *Burgess's consent.*

The State relies upon *Atkins v. State*[28] and other cases to support its argument that Burgess's execution of the waiver form vitiates the trial court's finding that the consent was not voluntary. *Atkins* held that "even if the initial entry into [the defendant's property] resulted in a warrantless search or seizure, the subsequent voluntary, written consent to search amounted to a waiver of the warrant

---

[25] (Citations and punctuation omitted.) *Brooks v. State*, 285 Ga. 424, 425-426 (677 SE2d 68) (2009), citing *Schneckloth v. Bustamonte*, 412 U. S. 218, 219, 233 (93 SCt 2041, 36 LE2d 854) (1973).

[26] (Punctuation omitted.) *State v. Turner*, 304 Ga. 356, 359 (1) (818 SE2d 589) (2018), quoting *State v. Tye*, 276 Ga. 559, 562 (580 SE2d 528) (2003).

[27] *Snider v. State*, 292 Ga. App. 180, 183 (663 SE2d 805) (2008).

[28] 173 Ga. App. 9, 12 (3) (325 SE2d 388) (1984), affirmed in part and remanded by *Atkins v. State*, 254 Ga. 641 (331 SE2d 597) (1985).

requirement.[29] In *Atkins*, this Court first determined that the defendant had freely and voluntarily consented to the search, and therefore, his written consent validly waived any unlawful previous intrusions.[30] But the mere fact that Burgess executed the written consent to search does not, as a matter of law, require reversal of the trial court's determination that the consent was not freely and voluntarily given.

In this case, the trial court found that although the TPO allowed the agents to enter Burgess's home and seize firearms and explosives, the State failed to present evidence that Burgess freely and voluntarily consented to the search, even after being presented with and signing the waiver form.[31] The trial court's finding is supported by our determination that the TPO did not authorize the search. There was no testimony that agents provided Burgess with the opportunity to refuse to consent to the search when the agents served the TPO, and by the time that the waiver form was presented to Burgess, officers already had discovered some methamphetamine, the

---

[29] (Punctuation and citations omitted.) *Atkins*, 173 Ga. App. at 12 (3).

[30] See id. at 11-12 (2). See also *State v. Sutton*, 258 Ga. 382 (2) (369 SE2d 249) (1988) (holding that because the defendant consented to the search any illegal entry on the property did not vitiate later consent by the defendant to the search).

[31] The trial court found that officers read Burgess his *Miranda* rights prior to his statement at the police station, but officers testified that they did so on the scene as well.

explosives, and many firearms. "Giving proper deference to the trial court's factual findings and credibility determinations, and based upon the totality of the circumstances, the record supports the trial court's conclusion that [Burgess] merely acquiesced to the authority of law enforcement rather than voluntarily consenting to the search of [his] home."[32]

(b) *A. S.'s consent.*

To the extent that the State contends that A. S.'s off-premises consent to search renders legal the officer's actions here, we do not agree. Based on the trial court's finding that Burgess, who was physically present at the house when officers arrived, was (1) not given the opportunity to refuse the search during the initial service of the TPO; and (2) did not freely or voluntarily execute the waiver mid-search, we cannot say that trial court erred by finding that A. S.'s pre-search, off-site consent authorized the search.[33]

---

[32] *Turner*, 304 Ga. at 361 (1) (a). See also *Code v. State*, 234 Ga. 90, 95 (II) (214 SE2d 873) (1975) ("[W]hen an officer represents to an accused that he has authority to search, when actually he does not, a resultant consent by the accused to the search is invalid. In these circumstances, the consent is merely a submission to an apparent legitimate display of legal authority to which all are required to submit.").

[33] See *Georgia v. Randolph*, 547 U. S. 103, 122-123 (III) (126 SCt 1515, 164 LE2d 208) (2006).

3. The State contends that even if the order did not allow the officers to effectuate the search, and even if there was no valid consent, the evidence should not be excluded because officers reasonably relied on the TPO to conduct the search.

(a) *Exclusionary rule.*

> The exclusionary rule is a judicially created remedy adopted to protect Fourth Amendment rights by deterring illegal searches and seizures. It is not intended to cure the invasion of the defendant's rights which he has already suffered, and it does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons. Because the rule is not constitutionally mandated and because of its broad deterrent purpose, it consistently has been applied only where its remedial objectives are thought most efficaciously served.[34]

Although this case presents a close question as to this issue, we agree with Burgess that the exclusionary rule applies to the search as a whole, and we affirm the trial court's determination that the exclusionary rule applied to the search of the outbuilding/garage.[35] Although officers testified at the suppression hearing that they

---

[34] (Citations and punctuation omitted.) *State v. Thackston*, 289 Ga. 412, 413 (1) (716 SE2d 517) (2011). See also *Teal*, 282 Ga. at 423 (2).

[35] See *State v. Gravitt*, 289 Ga. App. 868, 871 (2) (b) (658 SE2d 424) (2008) ("The indirect fruits of an illegal search or arrest should be suppressed when they bear a significantly close relationship to the underlying illegality."). Compare with *Teal*, 282 Ga. at 326-327 (2) (declining to apply the exclusionary rule to a warrantless

believed that the TPO authorized their entry into Burgess's home, they were aware that they did not have a warrant to enter the premises. Additionally, the TPO was, at most, limited to seizing firearms and explosives, and yet, officers proceeded to the outbuilding/garage to look for the methamphetamine in a place described to them by A. S. as being the location where they would find the methamphetamine. The officers who took A. S.'s statement prior to serving the TPO failed to apply for a warrant based on her statements regarding Burgess even though two days passed in between her statement and service of the TPO, and based on that same length of time, we cannot say that exigency prevented their application therefore. This is not a case in which the officers were merely serving the TPO and providing support for a petitioner's enforcement of her right to her property or to ensure her safety.[36] Instead, officers were engaged in a full-blown search of the entire premises without a warrant and without any exigencies of circumstance to support a determination that a warrantless search was reasonable under the circumstances or that a reasonable

search of a hotel room because an application for a warrant had been prepared based on evidence gathered prior to the illegal entry and inevitably would have been discovered).

[36] Compare with *Henderson*, 305 F3d at 1057-1058 (1) (A).

officer would believe that she could effectuate the search without first obtaining a warrant.[37]

(b) *Good faith exception.*

Alternatively, the State contends that the evidence from the search — both in terms of the officers' authority to search based on the TPO, and the officers' understanding of the scope of the property included by the TPO — should not be suppressed based on the good-faith exception as stated by the United States Supreme Court in *United States v. Leon*.[38] *Leon*, however, "has no application in this case. Not only is *Leon* factually distinguishable because the evidence was seized from [Burgess] without a search warrant, the *Leon* 'good faith' exception is not applicable in Georgia in light of our legislatively-mandated exclusionary rule found in OCGA § 17-5-30."[39] Moreover, as previously explained, the officers were aware that the

---

[37] See *Riley*, 573 U. S. at 401-402 (IV).

[38] 468 U. S. 897 (104 SCt 3405) (82 LEd2 677) (1984).

[39] (Punctuation omitted.) *Harvey v. State*, 266 Ga. 671, 672 (469 SE2d 176) (1996), citing *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992). See also OCGA § 17-5-30 (a) (1). We note that the Georgia Supreme Court recently granted a writ of certiorari in *Mobley v. State*, Case No. S18C1546 (Mar. 4, 2019), in which the Court stated it was concerned with the issue of whether, inter alia, the Court should continue to apply the rule announced in *Gary*, which declined to adopt the *Leon* good-faith exception.

22

TPO did not contain any directive to search for methamphetamine, and they were able to interview A. S. and could have applied for a warrant based on the support of her statements and the probable cause finding encompassed in the TPO. Accordingly, this argument is without merit.

4. Burgess also argues that the trial court erred by finding that Burgess's statement to the police at the station was freely and voluntarily entered. Based on our holding in Division 1 that the TPO did not constitute a valid warrant and the search was not otherwise authorized, we reverse the trial court as to its finding on this issue.

5. Based on our holdings in Divisions 1-4, supra, we need not address the parties' remaining enumerations of error.

Accordingly, to the extent that the trial court granted the motion to suppress, we affirm the order, and to the extent that the trial court denied the motion to suppress, we reverse.

*Judgment affirmed in part and reversed in part. Coomer, J., concurs. Dillard, C. J., concurs in Divisions 1, 2, 4, and 5 and in the judgment only in Division 3.\**

**\*DIVISION 3 OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2(a).**