**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 13, 2022**

# In the Court of Appeals of Georgia

A22A0920. THE STATE v. BOBBY LEE FISH.

MERCIER, Judge.

Following a traffic stop and subsequent search of the vehicle he was driving, Bobby Lee Fish was indicted for trafficking in methamphetamine, possession of methamphetamine, possession of a firearm during the commission of a felony (two counts), theft by receiving stolen property, and possession of a firearm by a convicted felon. The trial court granted Fish's motion to suppress all evidence from the traffic stop. The State filed this appeal,[1] arguing that the trial court erred by concluding that the arresting officer did not have jurisdiction to conduct a traffic stop and that the search was unlawful. Finding that the trial court did not err by holding that the search of the vehicle was unlawful, we affirm.

---

[1] See OCGA § 5-7-1 (a) (5).

"When reviewing a trial court's ruling on a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *State v. Allen*, 298 Ga. 1, 2 (1) (a) (779 SE2d 248) (2015) (citation and punctuation omitted). In our review, we must generally "accept the trial court's findings as to disputed facts unless they are clearly erroneous[.]" Id. "[W]e review de novo the trial court's application of law to the undisputed facts." *Terry v. State*, 358 Ga. App. 195, 198 (1) (854 SE2d 366) (2021) (citation, punctuation, and emphasis omitted). Viewed in this way, the evidence at the suppression hearing, which consisted of testimony by three police officers and video recordings from one officer's body camera and dashboard camera, showed the following.

On September 19, 2020, City of Acworth police officer Brandon Greene was in a marked patrol car across from a gas station at the intersection of Ross Road and Highway 92 inside the City of Acworth, in Cobb County. Greene was conducting surveillance at the gas station because the police department had received "multiple complaints of drug activity, drug sales going on at that gas station." While Greene was observing the gas station through binoculars, he noticed two males and a female walk between the gas station building and a vehicle multiple times and meet with

2

different people over a period of 20 to 30 minutes. The group returned to their vehicle, a black Chevrolet Sonic, and left. Greene did not observe any illegal activity at the gas station, but he deemed their behavior "suspicious."

Greene followed the vehicle and "started to run the tag on the car" on his computer in his patrol car. The computer search reported that "the tag that was on the car was no longer assigned to the car and it should have a different tag on it." Greene testified that he received information about the tag, and that he initiated the traffic stop by turning his emergency lights on while he was still in Cobb County. However, as they were close to the county line, the vehicle pulled over in Bartow County. The area where the vehicle stopped was the second location available after the officer initiated the stop that would not have impeded traffic, and only 10 to 15 seconds passed between Greene activating his lights and the vehicle pulling over.

Once both vehicles pulled over, Greene made contact with Fish, the driver. Shane McCall was riding in the front passenger seat, and Kirsten Starnes was in the backseat of the vehicle. Greene informed Fish that he pulled the vehicle over because the Sonic's license plate did not match the vehicle, and Fish responded that the vehicle was a rental car and presented the rental agreement.[2] Greene testified that the

---

[2] The rental agreement is not in the record.

agreement was for the rental of a white Chevrolet Sonic (while the vehicle Greene pulled over was a black Chevrolet Sonic) and had a different license plate number. Porsche Gallagher, and not Fish, was listed as the individual who had rented the vehicle on the rental agreement. Fish proceeded to make a phone call to a person he claimed was Gallagher, and he gave the phone to Greene. The woman on the telephone told Greene that "she had rented a car and that [Fish] had authorization to be driving the car."

During his conversation with Fish, Greene observed that Fish and McCall appeared nervous, so Greene requested consent to search the car, but Fish declined. Greene then testified that he "noticed an Emerson Police Department K-9 officer . . . sitting on 75 South off-ramp. He was just sitting there. And so [Greene] flagged [the officer] down to come over[.]" It took the K-9 officer less than one minute to join Greene, and the officer agreed to have his K-9 do "an open-air sniff" of the vehicle. Greene testified that "[n]o more than a few minutes" elapsed between the time Greene stopped the Sonic and called over the K-9 officer.[3]

_____

[3] Greene testified that his body camera and dashboard camera "didn't work" at the time of the traffic stop, but his body camera worked later that day when he took Fish to jail.

At some point, the occupants were asked to step out of the vehicle. A female Acworth Police Department Officer arrived and conducted a search of Starnes.[4] When she arrived the three vehicle occupants were outside of the vehicle, sitting on a guardrail, and the K-9 officer had not begun the K-9 search. The K-9 search did not begin until approximately four minutes after the female officer arrived. Prior to the K-9 search, Greene did not begin to write a citation for any of the vehicle occupants or seek to have the vehicle impounded.[5]

The K-9 search proceeded, and the dog alerted on the vehicle, meaning that the dog smelled narcotics. Greene then conducted a search of the vehicle, during which he found a glass pipe (of the kind commonly used to smoke methamphetamine), a 9 millimeter handgun[6] in the driver's side door, and a loaded .40 caliber handgun under the driver's seat. Under the passenger seat, Greene found a 9 millimeter handgun along with a digital scale and a small bag of what appeared to be methamphetamine.

_____

[4] The video recordings from the female officer's body camera and dashboard camera were played at the hearing.

[5] Greene testified that because he could not determine ownership of the car, he had to "[i]mpound the car until [Fish could] prove whose car it is and who has authorization to take it."

[6] Greene later learned that the gun was reported stolen from the Lincoln County Sheriff's Office in North Carolina.

Greene found sandwich bags in the trunk and a plastic box, containing 47 grams of a substance that appeared to be methamphetamine, stuck with magnets to a wall in the engine.

Fish filed a motion to suppress all evidence from the traffic stop, arguing that the police officer initiated the traffic stop outside of his jurisdiction and that the K-9 search was unlawful. The trial court agreed, granted the motion, and this appeal followed.

Once a defendant files a motion to suppress contraband discovered during a search and seizure, the State bears the burden of proving that the search and seizure were lawful. *Sherod v. State*, 334 Ga. App. 314, 319 (1) (779 SE2d 94) (2015). When a seizure occurs following an open-air K-9 drug sniff, "the State must show that it was lawful to detain the defendant until the time the drug dog indicated the presence of drugs." Id. (citation and punctuation omitted).

1. "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U. S. 348, 354 (II) (135 SCt 1609, 191 LE2d 492) (2015). However, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests

6

protected by the Constitution." *Terry*, 358 Ga. App. at 200 (1) (citation and punctuation omitted). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 575 U. S. at 354 (II) (citation omitted). "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are - or reasonably should have been - completed." Id. (citation and punctuation omitted).

During a traffic stop, an officer may take steps to ensure roadway safety, such as checking the driver's license and determining if the driver has any outstanding arrest warrants. *Rodriguez*, 575 U. S. at 355 (II). However, a dog sniff lacks the close connection to roadway safety, and instead "is a measure aimed at detecting evidence of ordinary criminal wrongdoing." Id. (citation and punctuation omitted). In order to determine the reasonableness of a seizure, we look to "what the police in fact do." Id. at 357 (II). "The critical question, then, is *not* whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs - i.e., adds time to - the stop." Id. (emphasis supplied, citation and punctuation omitted). "As a result, prolonging a traffic stop in order to conduct an open-air dog sniff

7

renders the seizure unlawful, *even if that process adds very little time to stop.*" *Terry*, 358 Ga. App. at 200 (1) (citation and punctuation omitted, emphasis in original); see also *State v. Herman*, 344 Ga. App. 359, 362 (810 SE2d 183) (2018) ("[W]e must determine whether the open-air dog sniff was done while some other task related to the mission of the traffic stop was still being conducted, so that the sniff did not add any time to the stop.") (citation and punctuation omitted).

Here, Greene testified that while he was standing outside of the vehicle with the occupants, he was not writing traffic citations, taking steps to have the vehicle impounded, or conducting any further investigation into the traffic stop, but was, instead, "investigating what the suspicious activity was at the gas station." In fact, despite the minimum of four minutes[7] that elapsed between the K-9 officer's arrival and the open-air sniff, Greene failed to pursue the traffic stop at all. "[I]n determining the reasonable duration of a stop, it is appropriate to examine whether the police diligently pursued the investigation." *Rodriguez*, 575 U. S. at 354 (II) (citation and punctuation omitted). While there may have been remaining tasks to perform for the

---

[7] The exact amount of time that elapsed during the traffic stop is unknown. However, by the time the female officer arrived at the traffic stop, the vehicle occupants had already exited the vehicle and the K-9 officer had arrived, and an additional four minutes elapsed after the female officer's arrival at the scene prior to the beginning of the K-9 search.

traffic stop, Greene failed to perform them. Instead, the undisputed evidence shows that Greene did not pursue the mission of the traffic stop for at least four minutes prior to the K-9 search. Thus the officers prolonged the traffic stop in order to conduct an K-9 open-air sniff, which renders the seizure at issue unlawful. See *State v. Blair*, 239 Ga. App. 340, 341-342 (521 SE2d 380) (1999) (detention impermissible when officer abandoned traffic stop and detained occupants to conduct a search for drugs)*; Terry*, 358 Ga. App. at 202 (1) (when officers completed the traffic stop prior to the open-air dog sniff, the seizure was unlawful, even if the process added "very little time to stop") (citation and punctuation omitted); Compare *Herman*, 344 Ga. App. at 362 (K-9 sniff, which was conducted while arresting officer was checking the driver's license, did not prolong the traffic stop at all so no violation of the Fourth Amendment).

As discussed in *Terry*, a police officer may detain a suspect after the conclusion of a traffic stop so long as the officer has reasonable articulable suspicion of criminal activity. See *Terry*, 358 Ga. App. at 202 (1). However, that did not occur here. While Greene testified that he was investigating the "suspicious activity . . . at the gas station," the State concedes that he did not have articulable suspicion of illegal drug activity sufficient to conduct the search.

9

As such, the trial court's finding that the officer abandoned the original purpose of the traffic stop to conduct the K-9 search was not clearly erroneous.

2. The State also contends that the trial court erred by finding that Greene lacked jurisdiction to conduct the traffic stop in Bartow County. However, because the trial court correctly determined that regardless of whether Greene was authorized to stop the vehicle, the K-9 search was unlawful, we need not address this claim. See generally *State v. Burgess*, 349 Ga. App. 486, 498 (5) (826 SE2d 352) (2019).

*Judgment affirmed. Dillard, P. J., and Markle, J., concur.*